UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:                                                          Case No. 8:08-bk-16972-KRM
                                                                Chapter 11
COLONY BEACH AND TENNIS CLUB
ASSOCIATION, INC.,

        Debtor.
_____/

COLONY BEACH & TENNIS CLUB, LTD.,

        Plaintiff,

vs.                                                             Adv. Pro. No.: 8:08-ap-00567-KRM

COLONY BEACH AND TENNIS CLUB
ASSOCIATION, INC.,

        Defendant.
_____/

COLONY BEACH AND TENNIS CLUB
ASSOCIATION, INC.,

        Third-Party Plaintiff,

vs.

RESORTS MANAGEMENT, INC., AND
COLONY BEACH & TENNIS CLUB, INC.,

        Third-Party Defendants.
_____/

**MEMORANDUM OPINION AND ORDER ON
(A) DEBTOR'S OBJECTION TO CLAIM NUMBERS 13 AND 14,
(B) PARTNERSHIP'S CLAIMS FOR DECLARATORY AND INJUNCTIVE
RELIEF, AND (C) DEBTOR'S COUNTERCLAIMS AND THIRD-PARTY CLAIMS**

        THIS PROCEEDING came before the Court for trial on May 20 - 22, 26 - 29 and June 1,

2009.  In this Chapter 11 case, the Court must determine various disputes between the Colony

Beach and Tennis Club Association, Inc., a Florida not-for-profit corporation managed and

administered by volunteer directors and officers (the "**Association**" or the "**Debtor**"), and Colony Beach & Tennis Club, Ltd. (the "**Partnership**"), Resorts Management, Inc., the general partner of the Partnership (the "**General Partner**"), and Colony Beach & Tennis Club, Inc. (the "**Manager**").  The General Partner and Partnership are each for-profit entities that operate the Colony Beach & Tennis Club, a Condominium Resort Hotel ("**The Colony**" or the "**Hotel**") located on the Gulf of Mexico in Longboat Key, Florida, using the condominium units, common elements and appurtenances owned by the members of the Association (the "**Unit Owners**"). The Manager is a for-profit entity that managed the Association through June 30, 2007.

Dr. Murray J. Klauber ("**Dr. Klauber**") originally developed The Colony and is the president and principal of the General Partner.  All management decisions respecting the Hotel are made by the General Partner and Dr. Klauber is the decision maker.  Since 1985, Katherine Klauber Moulton ("**Ms. Moulton**"), the daughter of Dr. Klauber, has been the general manager of the Hotel.  She is also the President of the Manager.  Ms. Moulton's credentials are quite impressive in terms of her education and the recognitions she has received in the hospitality industry.

The Partnership commenced this action against the Association in state court.  The Association removed the case to this Court.  (Doc. No. 1.)  The Partnership seeks (a) damages for breach of  certain agreements between or affecting the parties, (b) declaratory relief that the Association has the obligation to the Partnership to pay by assessment of the Unit Owners ongoing operational expenses for the buildings, common elements and recreational facilities at The Colony, as well as the obligation to pay for the necessary repairs and renovations to those facilities to allow them to be used by the Partnership as a luxury resort hotel, and (c) temporary

and permanent injunctive relief seeking to require the Association to assess the Unit Owners for the operational shortfalls and the costs of the major repair work required at The Colony.

The Association filed an answer and affirmative defenses.  The Association also filed counterclaims against the Partnership seeking (a) a declaration that an agreement entered into on December 1, 1984 (the "**1984 Agreement**"), among the Association, the Partnership, the General Partner, the Manager, and Colony Beach, Inc. ("**CBI**"), another entity controlled by Dr. Klauber, was *ultra vires* and invalid as to the Association, (b) an equitable accounting of the Partnership's operation of The Colony, and (c) damages for breach of the 1984 Agreement.  The Association also filed third-party claims against the General Partner and the Manager alleging breach of the 1984 Agreement and a management agreement (the "**Management Agreement**") relating to the operations of the Hotel and the Association.

Finally, the Partnership filed Claim No. 13 ("**Claim No. 13**") seeking recovery of damages against the Association, including lost revenues, based on the Debtor's failure to (a) fulfill its alleged obligations to assess its members and (b) maintain and repair the buildings and other common elements.  (Ex. 8.)  The Manager filed Claim No. 14 ("**Claim No. 14**") asserting similar claims against the Association.  (Ex. 9.)  The Debtor objected to Claim No. 13 and Claim No. 14, which objections were heard in this adversary proceeding.

For the reasons stated orally and recorded in open court on July 31, 2009, which shall constitute the decision of this Court, as supplemented by the following additional findings of fact and conclusions of law, the objections to Claim No. 13 and Claim No. 14 are sustained and the claims of the Partnership and Manager are disallowed in their entirety.  The declaratory and injunctive relief sought by the Partnership is denied.  The declaratory relief sought by the Association regarding the 1984 Agreement, contending that it is *ultra vires* for the Association to

be obligated to pay the operating shortfalls of the Partnership, is granted.  Because all of the relief sought against the Association has been denied, the Association's counterclaims and third-party claims are denied as moot.[1]

## FINDINGS OF FACT

### A.    Structure of The Colony.

The Association was established as a condominium association pursuant to the Declaration of Condominium of Colony Beach & Tennis Club dated November 29, 1973 (the "**Declaration**"), for the purpose of administering the condominium property.  (Ex. 13.)  The Association's membership consists of the owners of the 237 condominium units at The Colony.  (Ex. 14 at § 4.1.)  The Unit Owners have no right to use or occupy their unit or to use the facilities at The Colony except as guests of the Hotel and then only for thirty (30) days each year (Ex. 22 at §§ 10.1, 10.2.)

Concurrently with the establishment of The Colony, the Partnership was formed pursuant to a Certificate and Agreement of Limited Partnership for Colony Beach & Tennis Club, Ltd. (the "**Partnership Agreement**"), to operate and manage the condominium units at The Colony as rental accommodations in the operation of the Hotel.  (Ex. 22.)  All but five Unit Owners are limited partners in the Partnership (the "**Limited Partners**") and are required to make their units at The Colony available for occupancy by third parties as rental accommodations for the Hotel.  (Ex. 22 at § 10.1.)

In addition to owning and controlling the General Partner, the Manager and CBI, Dr. Klauber owns or controls other businesses at The Colony, including Le Tennique, Inc., a retail

---

[1] The debtor characterizes its counterclaims and third-party claims as "defensive," meaning that the claims were ones "that the defendant would not have bothered to bring had the plaintiff not picked a fight." *State Treasurer of State of Michigan v. Barry*, 168 F.3d 8, 20 (11th Cir. 1999) (Cox, J., specially concurring).  By ruling in favor of the Association, the Court did not find it necessary to address the Association's claims.  The debtor did not present any evidence as to any damages it suffered.

clothing shop, Colony Beach Tennis Shop, a sports shop owned and operated by a general partnership in which Dr. Klauber is a 95% partner, and Colony Special Services, Inc. f/k/a A Special Place, Inc., a concierge service.  (Ex. 1.)  The Manager also operates all of the food and beverage amenities at The Colony including the Hotel's restaurant, a convenience store called Tastebuds, the Monkey Bar, the Bongo Bar and the banquet facilities.  (Ex. 1.)  Collectively, these separate businesses operated for the economic benefit of Dr. Klauber at The Colony are referred to as the "**Klauber Businesses**."

**B.**     **The Governing Documents.**

The obligations, duties and powers of the Association are set forth in its governing documents, consisting of the Declaration, its Articles of Incorporation (the "**Articles**"), and its Bylaws (the "**Bylaws**") (collectively, the "**Governing Documents**").

1.     The Declaration.

The Declaration was prepared and witnessed by William W. Merrill ("**Merrill**"), one of Dr. Klauber's attorneys.  It was signed by Joseph Penner ("**Penner**") and Dr. Klauber, as the general partners of Colony Beach Associates, Ltd. ("**CBA**"), the entity that served as the original developer of The Colony.  (Ex. 13 at 22.)  The Declaration was recorded in the public records of Sarasota County, Florida.  (Ex. 13.)  The Declaration gave the Association and its Board of Directors (the "**Board**") exclusive authority to manage the affairs of the condominium.  (Ex. 13 at §§ 3.5, 6.2, 8.3.)

The purpose of the Declaration is to submit the land to the condominium form of ownership and use under the Florida Condominium Act (the "**Condominium Act**").[2]  (Ex. 13 at § 1.1.)  The Declaration enumerates the typical common expenses for a residential condominium.

---

[2] Fla. Stat. §§ 718.101 et seq. (2009).

The Declaration provides that the Association is responsible for maintenance, repairs and replacement of all but the interiors of the buildings at The Colony.  (Ex. 13 at § 6.2.)

The Declaration provides initially that it shall be the responsibility of the Unit Owners to maintain all portions of their units except those portions maintained by the Association.  (Ex. 13 at § 6.3.)  However, the Declaration also expressly states:

> Notwithstanding anything herein to the contrary, so long as the use of any unit is being made available to the Partnership for operation with the other units as rental accommodations and the Partnership is maintaining and repairing such unit, the owner of such unit shall be relieved of his obligation hereunder to that extent.  (Ex. 13 at § 6.3(a).)

The Unit Owners must approve any alterations or improvements to the common elements of The Colony and no alterations or improvements of the individual units may be made without first obtaining the written approval of the Board.  (Ex. 13 at § 6.4.)

The making and collection of assessments against the Unit Owners for common expenses must be pursuant to the Condominium Act and the Bylaws.  (Ex. 13 at § 7.1.)  However, Section 7.2 of the Declaration relieves Unit Owners who have made their units available to the Partnership from paying assessments:  "Unit owners who have made available the use of their unit to the Partnership will be relieved of paying assessments only to the extent that the Partnership makes such payments and assumes all other responsibilities of a unit owner in that regard." (Ex. 13.)

The Association has all the powers and duties reasonably necessary to operate the condominium.  (Ex. 13 at § 8.3.)  Although the Association is permitted to delegate some powers and duties to a manager of the Association, it may not delegate those powers and duties that specifically require the approval of the Board or the Unit Owners.  (Ex. 13 at § 8.3.)  The Declaration can be amended only upon notice, at a meeting of the Association and with the

approval of not less than 75% of the Board and not less than 75% of the Unit Owners. (Ex. 13 at § 15.3.)

When The Colony was formed, Dr. Klauber excluded from the Declaration certain properties and facilities.  (Ex. 19.)  The excluded properties consist of four parcels of land on which the swimming pool and tennis courts of the Hotel are located.  (Ex. 19.)  Dr. Klauber also retained ownership of a locker room condominium unit and a meeting room and clubhouse condominium unit.  (Ex. 19.)  Dr. Klauber made these properties and facilities, collectively the "**Recreational Properties,**" available for use to the Hotel pursuant to a 99-year recreational facilities lease (the "**Lease**").  (Ex. 19.)  The Lease was attached as an exhibit to the Declaration that was recorded in the public records of Sarasota, Florida.  (Ex. 13 at § 3.8.)  Any amendment to the Declaration or Bylaws "in any way dealing with or relating to" the Lease must be signed by all of the lessors under the Lease as well as the record owners of the fee simple title to the land subject to the Lease.  (Ex. 13 at § 15.4.)

The Lease was prepared by Merrill.  The Association was the lessee, with Penner and Merrill executing the Lease as the President and Secretary, respectively, on behalf of the Association.  (Ex. 19 at 22.)  The lessor under the Lease was CBA with Dr. Klauber and Penner executing the Lease as its general partners.  (Ex. 19 at 22.)  Through a series of transactions over several years, ownership of the Recreational Properties and the interest as lessor under the Lease was transferred to (a) the Manager (45%) and CBI (35%), entities owned and controlled by Dr. Klauber, (b) a trust set up by Merrill (5%), and (c) a trust set up by Herbert Field ("**Field**") (15%).  Field was the original seller of the property at The Colony to CBA. (Ex. 196.)  All of the lessors under the Lease and the owners of the Recreational Properties (the Manager, CBI, the Field trust and the Merrill trust) are collectively referred to as the "**Lessors**."

Although the lessee under the Lease is the Association, all lease payments have been paid by the Partnership from its revenues. The Partnership ceased making the lease payments in October of 2008, immediately prior to the filing of this Chapter 11 case by the Association. The Lease has been rejected by the Association with approval of this Court. (Doc. No. 106.) In a separate dispute, the Court has denied all rejection damage claims of the Lessors against the Association on the grounds that the Lease is unconscionable and unenforceable.[3]

Any amendment to the Declaration must be attached to a certificate certifying that the amendment was properly adopted by the Association, executed by all officers of the Association with the formalities of a deed, and recorded in the public records of Sarasota County, Florida. (Ex. 13 at § 15.5.)

2.    The Articles.

The Association's Articles were filed with the Florida Secretary of State and a copy was attached as an exhibit to the Declaration that was recorded in the public records of Sarasota County, Florida. (Ex. 14; Ex. 13 at § 3.17.) Section 2.1 of the Articles (Ex. 14) provide that the purpose of the Association "is to provide an entity pursuant to Section 711.12 of the Condominium Act, Florida Statutes, for the operation of COLONY BEACH & TENNIS CLUB, a Condominium Resort Hotel, herein referred to as the 'Condominium', located at 1630 Gulf of Mexico Drive, Longboat Key, Sarasota County, Florida."[4] The Articles make clear that the affairs of the Association shall be managed by its Board. (Ex. 14 at § 5.1.)

From November 29, 1973, until December 1, 1977, Penner, Dr. Klauber, and Merrill expressly reserved for themselves exclusive authority to manage and administer the affairs of the Association as the Association's original directors and officers. (Ex. 14 at § 5.4.) Effective with

---

[3] *See* Adv. Pro. No. 8:08-ap-00568-KRM.
[4] In 1976, Chapter 711 of the Florida Statutes was repealed and replaced by Chapter 718 of the Florida Statutes.

the first Board election on December 1, 1977, control and management of the Association was shifted to the Unit Owners.  (Ex. 14 at §§ 5.3, 6.1.)  The Board has since consisted of volunteers elected by the Unit Owners.  Until the present controversy, the Board generally met only once a year in connection with the annual meeting of the Unit Owners, and the business affairs of the Association were handled by either the Manager or the General Partner.  (5/21/09 Tr. 127:22-128:17;  Ex. 187 at 78:10-17.)

The Association is vested with all of the common law and statutory powers of a not-for-profit corporation that are not otherwise in conflict with the Articles.  (Ex. 14 at § 3.1.)  Section 3.2 of the Articles states:  "The Association shall have all of the powers and duties set forth in the Condominium Act of the State of Florida, except as limited by these Articles of Incorporation and by the Declaration of Condominium . . . and all of the powers and duties reasonably necessary to operate the Condominium pursuant to such Declaration . . . ."

The Association also has specific enumerated powers, including, but not limited to, the power to (a) make and collect assessments to defray the costs, expenses and losses of the condominium, (b) use the proceeds of assessments in the exercise of its powers and duties, (c) maintain, repair, replace and operate the condominium property, (d) reconstruct improvements after casualty and further improve the property, and (e) contract for the management of the condominium and delegate to such contractor all powers and duties of the Association, except such as are specifically required by the Declaration to have the approval of the Board or the membership of the Association. (14 at § 3.2.)

The funds collected by the Association must be held in trust for the benefit of the Unit Owners in accordance with the Declaration, the Articles and the Bylaws.  (Ex. 14 at § 3.3.)  The

Articles can be amended only upon notice, at a meeting of the Association and with the approval of not less than 75% of the Board and not less than 75% of the Unit Owners.  (Ex. 14 at § 9.1.)

    3.    <u>The Bylaws.</u>

The Association's Bylaws were adopted by Dr. Klauber, Penner and Merrill.  A copy was attached as an exhibit to the Declaration that was recorded in the public records of Sarasota County, Florida.  (Ex. 13 at § 3.16.)  The Bylaws gave the Board exclusive authority to manage the affairs of the Association, subject only to approval by Unit Owners when such approval is specifically required. (Ex. 15 at § 4.)

The Bylaws provide that the Board shall adopt a budget annually to defray the common expenses and to fund required reserves, including reserves for deferred maintenance and for repair or replacement due to damage, depreciation or obsolescence.  (Ex. 15 at § 6.2.)  The procedure and manner of assessment of the Unit Owners by the Association is set forth in the Bylaws.  (Ex. 15 at §§ 6.3 and 6.6.)  Only two types of assessments against Unit Owners are authorized: annual assessments and emergency assessments.  (Ex. 15 at §§ 6.3 and 6.6.)  The Board determines the amount of annual assessments as part of the Board's budgeting responsibility.  (Ex. 15 at §§ 6.2 and 6.3.)  Annual assessments of the Unit Owners for the items included in the annual budget adopted by the Board are required to be made prior to the start of the fiscal year for which such assessment relates.  (Ex. 18 at ¶ 4.)  Emergency assessments are defined in Section 6.6 as "[a]ssessments for common expenses of emergencies that cannot be paid from the annual assessments for common expenses . . . ."  Assessments for emergencies may only be made by the Association with the written approval of a majority of the affected Unit Owners.  (Ex. 15 at § 6.6.)

Like the Declaration and the Articles, the Bylaws contain an express provision that Unit Owners who have made their units available to the Partnership are expressly relieved from paying assessments. (Ex. 15 at § 6.5.)

The Bylaws can be amended only with the approval of either:  (a) not less than 75% of the Board and 75% of the Unit Owners; or (b) not less than 80% of the Unit Owners.  (Ex. 15 at § 8.2.)  Section 8.3 of the Bylaws provides that "[n]o amendment shall be made that is in conflict with the Articles of Incorporation or the Declaration of Condominium."  Any amendment to the Bylaws must be attached to a certificate certifying that the amendment was properly adopted by the Association, executed by all officers of the Association with the formalities of a deed, and recorded in the public records of Sarasota County.  (Ex. 15 at § 8.4.)

## C.    The Partnership Agreement.

The Partnership Agreement (Ex. 22) states in Section 3 that "[t]he Partnership is formed for the primary purpose of operating and managing as rental accommodations, in a beach resort and tennis club, 232 hotel condominium units . . . ."  The General Partner has "full, exclusive and complete authority and discretion in the management and control of the business of the Partnership . . . and shall make all decisions affecting the business of the Partnership." (Ex. 22 at § 7.1.)

The Partnership Agreement explicitly provides that the General Partner's management of the Partnership is to the exclusion of the Limited Partners by stating "[n]o Limited Partner, as such, shall take part in the management of the business, transact any business for the Partnership or have the power to sign for or bind the Partnership to any agreements or document." (Ex. 22 at § 8.2.) Accordingly, the Association, the Unit Owners, and the Limited Partners have no control over the use and operation of the condominium units, the Recreational Properties, or the common

elements as rental accommodations and amenities for the operation by the General Partner of the Hotel.

Each of the Unit Owners, as a Limited Partner, is required to make the condominium unit they own "available at all times for occupancy by third parties as rental accommodations in connection with the business of the Partnership." (Ex. 22 at § 10.1.) With the exception of thirty (30) days' use of a unit at The Colony, which use is subject to certain advance reservation requirements, a Limited Partner has no right to occupy any condominium unit or units operated by the Partnership, including the unit or units owned by such Limited Partner, except upon the same rates, terms and conditions, and subject to the same rules and regulations as the general public. (Ex. 22 at § 10.1.)

The Partnership Agreement also makes clear that the Limited Partners are not subject to assessment and have no personal liability for the Partnership's debts.  (Ex. 22 at § 8.1.)  The General Partner has "full power and authority, in behalf of and in the name of the Partnership to . . . [e]stablish all policy pertaining to the operation of the Project as a luxury resort hotel, manage and control all business conducted on the premises of the Project, and adopt rules and regulations governing the use of the premises of the Project by the Limited Partners and the public." (Ex. 22 at § 7.1(r).)

Section 7.1(r) of the Partnership Agreement (Ex. 22) calls for the General Partner to operate the Unit Owners' condominium units, the Recreational Properties, and the common elements of the condominium as "a luxury resort hotel."

**D.**     **Other Agreements.**

     1.     The Management Agreement.

At the same time that Dr. Klauber formed The Colony, he also formed the Manager as a for-profit corporation to act as the management company for the Association pursuant to the

Management Agreement.  (Ex. 20.)  The Management Agreement was executed by Penner and

Merrill as officers of the Association, and by Dr. Klauber and Merrill as the President and

Secretary, respectively, of the Manager.  (Ex. 20 at § 8.)  The Management Agreement remained

in place from The Colony's inception until the Association terminated the Management

Agreement effective June 30, 2007.  (Ex. 20; Ex. 188 at 112:9-14.)

The Management Agreement gave "[t]he Manager, to the exclusion of all persons

including the Association and its members . . . all the powers and duties of the Association as set

forth in its Declaration of Condominium, its Articles of Incorporation and Bylaws (except such

thereof as are specifically required to be exercised by its directors or members) and the

Recreational Facilities Lease."  (Ex. 20 at § 4.)  The Manager had the duty and power to

"[e]stablish reserves, both funded and unfunded, for the payment of any and all costs and

expenses of the Association to be disbursed by the Manager hereunder."  (Ex. 20 at § 4.10.)

With respect to the Association's budgets, the Manager had the duty and power to prepare an

annual operating budget, taking into consideration the general condition of the Association and

the condominium.  (Ex. 20 at § 4.13.)  No expenses could be incurred or commitments made by

the Manager in connection with the maintenance and operation of the condominium and

Recreational Facilities in excess of the amounts allocated to the various classifications of

expense in the approved budget without the prior consent of the Association.  (Ex. 20 at § 4.13.)

Under the terms of the Management Agreement, as compensation for its services, the

Manager received a net fee of 5% of the Association's assessments.  (Ex. 20 at § 7.)  The

Management Agreement was amended in connection with the execution of the 1984 Agreement

and the approval of the Tenth Amendment to Certificate and Agreement of Limited Partnership

of Colony Beach & Tennis Club, Ltd. (the "**Tenth Amendment**"). (Ex. 21.)  The purpose of the

amendment was to enable the Manager to receive a fee based on the expenses incurred and paid by the Partnership, and allocated to the Association, as opposed to the assessments collected by the Association. (Ex. 21 at § 2.)

2.    The 1984 Agreement and the Tenth Amendment to the Partnership Agreement.

The primary purpose and effect of the 1984 Agreement was to give the General Partner full and complete control over the operation of the properties at The Colony, over which it already had rights of use, and to enable the General Partner to operate the property as a first-class resort hotel. The 1984 Agreement has been rejected by the Association with approval of this Court. (Doc. No. 81.)

The effectiveness of the 1984 Agreement was conditioned on a timely amendment of the Partnership Agreement. (Ex. 27 at ¶ 14.) The salient terms of the 1984 Agreement were approved by the General Partner and the Limited Partners and incorporated into the Tenth Amendment. (Ex. 23.)

Pursuant to the 1984 Agreement and the Tenth Amendment, the Partnership agreed to pay and record, as an expense of the Partnership, the "Obligations." (Ex. 27 at ¶ 2; Ex. 23 at ¶ 1.) The term "Obligations" was broadly defined to include everything that either the Association would have had to pay as an expense associated with the properties used by the Partnership or that the Partnership would have had to pay in order to operate and maintain the Hotel. (Ex. 27 at ¶ 2; Ex. 23 at ¶ 1.) As a result, the Partnership utilized the revenues from operating the Hotel to pay all of the expenses of operating and maintaining the Hotel.

Prior to the Tenth Amendment, the Partnership made cash distributions to the Limited Partners, who then paid assessments, as Unit Owners, to the Association. (5/21/09 Tr. 14:1-7.) The funds from the assessments were needed by the Partnership to operate and maintain the Hotel. As a result of the Tenth Amendment, (a) the Partnership stopped making distributions of

cash to the Limited Partners and, instead, used the revenues of the Hotel to pay all of the expenses at The Colony, including maintenance costs, capital improvements, and payments due under the Lease, and (b) the Association stopped making assessments of the Unit Owners because expenses were being paid by the Partnership.

After the adoption of the Tenth Amendment, the Association essentially ceded its activities and responsibilities to the Partnership and the General Partner who assumed such responsibilities. For example, the Partnership and the General Partner assumed the Association's budgeting responsibilities, and the Association relinquished any authority to reject the Partnership's budgets for the Association. (Ex. 27 at ¶ 2.) The Association retained only the right to review the budget prepared by the Partnership. (Ex. 27 at ¶ 2.) In turn, the General Partner agreed to indemnify the Board for any "abuse" of budgeting responsibilities.

The Partnership agreed not to exceed budgeted amounts for the "Obligations." Such amounts were used to calculate the amount that the General Partner was entitled to take each year under the Partnership Agreement as a distribution. The distribution formula in the Partnership Agreement was based upon a "Preferential Amount" of $1,398,105, representing the first dollars spent by the Partnership to pay the Obligations each year. (Ex. 22 at §11.2(a).) Once the expenses exceeded the Preferential Amount, the General Partner was entitled to take a cash distribution from the Partnership equal to 50% of the amount paid by the Partnership in expenses for Obligations in excess of the Preferential Amount. (Ex. 22 at §11.2(b).) This cash distribution to the General Partner was payable regardless of the actual profitability of the Partnership from its business operations in that year. (*See, e.g.* Ex. 43 at 3-4; Ex. 44 at 3-4.)

The General Partner was in control of the accounting and allocation of expenses charged to the Association as a matter of bookkeeping. The larger the amount of expenses that the

General Partner allocated to the Association's "Obligations," the greater the amount of distribution the General Partner would receive.

The Preferential Amount was set in 1973, but there was no formula for any change over time. (Ex. 22 at §11.2(a).) There was no built-in adjustment or index to account for inflation in costs over time. The Preferential Amount could not be adjusted without the agreement of the General Partner, which has never agreed to a change. (5/21/09 Tr. 100:8-12.) The Preferential Amount was not changed by the 1984 Agreement. The same Preferential Amount that was used for calculating distributions to the General Partner based upon expenses in 1973 was still being used in the fiscal year ending on April 30, 2007 (the last year the Partnership provided financial statements).

Under the 1984 Agreement, the Partnership agreed to pay $45,000 per year to the Association for reserves to establish "such reserves as are deemed necessary and appropriate for the continued operation of the Project as a first class resort hotel." (Ex. 27 at ¶ 2.) The Partnership never contributed the $45,000 per year to the Association's reserves. Instead, the Partnership only provided $28,400 per year to the Association's reserves, the equivalent of $10 per month per condominium unit ($10 per month x 237 units x 12 months).

The Manager and CBI, the two Lessors of the Lease controlled by Dr. Klauber, were signatories to the 1984 Agreement. They agreed to reduce the rent due under the Lease each year to the extent that the Partnership did not pay the Unit Owners' property taxes from Hotel revenue. (Ex. 27 ¶ 7.) The Partnership did pay the property taxes of the Unit Owners, but only until 2001. (Ex. 319.)

Under the 1984 Agreement, any proposed capital expenditures exceeding $50,000 and casualty expenditures exceeding $25,000 had to be reviewed by two Association Board members, two Hotel representatives, and two of the Partnership's accountants. (Ex. 27 at ¶ 2.)

The 1984 Agreement provided for a "special assessment" as the means for the Association and the Unit Owners to determine if they would fund the cash flow shortfalls and capital expenditures that the Partnership could not pay. (Ex. 27 at ¶ 2.) The undisputed evidence showed that all parties acted as if they interpreted the "special assessment" provisions in the 1984 Agreement to require submission of any proposed "special assessment" to the Unit Owners for vote. No one testified that a "special assessment" could be imposed on the Unit Owner's under the 1984 Agreement without an affirmative vote of a majority of the Unit Owners eligible to vote. In December 2004, the Board determined that any assessment must be put to a vote. (Ex. 280.) After the vote failed, the Partnership's promotional materials continued to state that "the vote required to pass the assessment for repairs is 51%." (Ex. 309.) Mr. Salvatore J. Zizza, a Unit Owner who served as president of the Association during the votes on the special assessments in 2005 and 2006, testified that putting the assessment to a vote of the Unit Owners was necessary and appropriate. (5/21/09 Tr. 136:11-15.) Mr. Steven Mitchell, the attorney for the Partnership, testified that all the proper procedures were followed to put the assessment up for Unit Owner vote. (5/26/09 Tr. 87:24-88:13.) Ms. Moulton testified that the General Partner supported putting the assessment to a vote and that putting the assessment to vote was the proper procedure to follow. (5/26/09 Tr. 251:16-21, 252:25-253:1-5.)

The 1984 Agreement never became a "governing document" of the condominium. Neither the Declaration, the Articles, nor the Bylaws were ever amended to incorporate the 1984 Agreement, which was never approved by the Unit Owners as an amendment to the Declaration.

The 1984 Agreement was not recorded in the public records of Sarasota County, Florida. At the time of the execution of the 1984 Agreement, the Association was in the middle of a ten-year period when it was administratively dissolved by the Florida Secretary of State. (Ex. 5.) Dr. Klauber caused the reinstatement of the Association in 1990 by signing as the president of the Association. (Ex. 6.) Moreover, two of the Lessors, Merrill and Field, never signed the 1984 Agreement, even though they owned 5% and 15% interests, respectively, in the Recreational Properties and the Lease. (Ex. 27.)

**E.**     **Preparation of the Association's Annual Budgets and Establishment of Reserves.**

For the past twenty-five years, the General Partner and Manger directed and controlled the budgeting for reserves and the maintenance of the common elements. The General Partner and Manager underreported the costs of replacement of the common areas and failed to properly set reserves to address the necessary capital repairs that the Partnership has sued to force the Association to make.

The only witness who testified regarding the adequacy of reserves for hotels and beach resorts was the Association's hotel and resort expert, Luis Plasencia ("**Mr. Plasencia**"), who testified that reserves should have been set each year at 5% to 7% of gross annual revenues of the Hotel. (5/28/09 Tr. 84:10-17.) Mr. Plasencia described the annual reserve of $28,440 that the Hotel paid for the Association's reserves as "ridiculously low" and inadequate. (5/28/09 Tr. 85:18-19.) The Partnership's annual audited financial statements also show that the Partnership never established or funded any reserves for itself. (*See, e.g.,* Ex. 46; Ex. 47.)

The record demonstrates, for example, that each year, Ms. Moulton, as the property manager, and the Partnership's maintenance director conducted a study to estimate the remaining useful lives and current replacement costs of the components of common property and the Recreational Properties at The Colony. She then advised the Association regarding reserve

requirements and replacement costs for the common elements and the Recreational Properties. This advice was included in supplementary information contained in the audited financial statements prepared each year for the Association. (*See, e.g.,* Ex. 50 at 10; Ex. 54 at 10.) As of April 30, 2001, the report reflected that the estimated current replacement costs were $1,215,000, the reserve funding requirement based upon current replacement costs was $190,808, and the Association's replacement reserve fund balance was $475,118. (Ex. 50 at 10.) Accordingly, the replacement reserve fund balance exceeded the reserve funding requirement. As of April 30, 2005, in the financial statement issued on December 6, 2005, the report advised that the estimated current replacement costs were $1,655,650, the reserve funding requirement was $1,127,457 and the replacement fund balance was $398,610. (Ex. 54 at 10.) Only one year later, for the Association's financial statement issued on December 11, 2006, for the fiscal year ending April 30, 2006, Ms. Moulton and the Partnership's maintenance director reported that the replacement cost estimates had jumped to $13,650,624 and that the reserve funding requirement had similarly jumped to $12,984,836. (Ex. 55 at 10.)

The Partnership has suggested that the Unit Owners were aware of the Partnership's inadequate funding of the reserves. Ms. Moulton testified that the Board was left to decide whether to "pay now or pay later" for major capital repairs. (5/27/09 Tr. 11:11-12:4.) Ms. Moulton also testified that the Unit Owners were aware of the "falsity" of the information presented in the audited financials regarding the reserves. (5/26/09 Tr. 244:19-25 & 245:1-5.) Although each of the Association's financial statements stated that after an inspection of The Colony, "[t]he Property Manager conducted a study . . . to estimate the . . . current replacement costs" for items such as the roofs, buildings and pavement, Ms. Moulton suggested that the numbers reflected in the financials were "not actually for replacement of major items" and that

the Unit Owners knew that these were not really intended to be true replacement costs.  (5/26/09 Tr. 244:19-25 & 245:1-5.)

Ms. Moulton's testimony, however, is not supported by the documents, which show that in each year until 2006, the Unit Owners received a written statement indicating that the Association had plenty of money in the reserve account to meet the current replacement cost of major capital items.  It cannot be said, therefore, that the Unit Owners were deciding whether to "pay now or pay later."   At most, they were assenting to a benign report showing that the Association already had sufficient reserves to address any capital needs.

Despite being obligated to do so under the Tenth Amendment and the 1984 Agreement, the General Partner never established or funded adequate reserves to operate the Hotel as either a "luxury resort hotel" or a "first class resort hotel."   Nor did the Manager prepare budgets that took into account the existing conditions and repair needs of the property as was required under the Management Agreement.   Rather, the annual reserves which the Partnership paid for the Association were woefully inadequate.   Despite assuring the Unit Owners each and every year that the reserves were sufficient to cover the replacement costs, the Manager and the General Partner were not taking the proper steps to set aside sufficient funds for the preservation of The Colony.

## F.     Dr. Klauber's Operation of the Partnership.

The Hotel is a tennis and beach resort, as the Hotel's name states.   The Court heard testimony that tennis' popularity has waned since the 1990's and perhaps even the 1980's. (Partnership Ex. 43; 5/22/09 Tr. 76:11-18; 5/28/09 Tr. 76:13-14.)   It is undisputed that the physical condition of The Colony has deteriorated and the Hotel's occupancy began declining after 1996.  (Ex. 304; 5/22/09 Tr. 74:20-75:5.)

The Partnership was sustaining losses before the General Partner first claimed that the condominium exteriors required renovation in the Fall of 2004.  (Ex. 319.)  In five of the last seven years for which audited financial statements are available, the Partnership sustained losses. (*See, e.g.,* Ex. 43 at 4; Ex. 45 at 4.)  Over this same period, the General Partner took aggregate cash distributions of $2,560,188 notwithstanding that the Partnership incurred a net loss of $1,850,942.

The record demonstrates that the total due from the Klauber Businesses to the Partnership fluctuated from month to month, with the highest balance being $1,395,033.78 due on January 31, 2007.  Dr. Klauber maintains that these intercompany loans and activities are not prohibited by the Partnership Agreement.

After initiating an examination, in 2007, of the financial affairs of the Hotel and Partnership, the Association learned of certain practices which its Board found to be troubling. One of these is the negative capital account of the General Partner.  The Association noted that, as of April 30, 2007, when the Partnership sued the Association, the Partnership would have had available cash of $3,000,714 (cash on hand of $1,156,896 plus the General Partner's capital account deficit of $1,376,189, plus the intercompany loan balance of $467,629), if the General Partner had ceased allowing Partnership funds to be used by the Klauber Businesses and had brought its burgeoning negative capital account within the Partnership to a zero balance.  (Ex. 49 at 4.)  Dr. Klauber contends that the General Partner's negative capital account is of no consequence as long as the Partnership is operating.  (5/26/09 Tr. 80:6-18.)

Another "accounting" dispute concerns the Unit Owners' voluntary contribution, by special assessment, of approximately $800,000 to assist the Partnership in the aftermath of the 9/11 terrorist attack.  But, at that time, the Partnership was borrowing funds and pledging all of

its assets to secure a loan, and Dr. Klauber was borrowing money from the Partnership.  (Ex. 319; Ex. 49 at 9.)  During this same period, in 2001, the General Partner used Partnership funds to replace the roof on the restaurant, one of Dr. Klauber's profit centers, but charged the cost to the Association.  (6/1/09 Tr. 22:1-4.)  The Partnership's auditor testified that one of the reasons the Partnership's audit for the fiscal year ending April 30, 2008, was never completed was because of the failure to address how to treat that roof improvement.  (Ex. 192 at 30:20-32:07.)

The propriety and impact of (a) alleged inherent conflicts of interest and potential self dealing within the Partnership that benefited the Klauber Businesses, (b) the intercompany loans, (c) the payment of guaranty fees to Dr. Klauber, (d) the loans to Dr. Klauber, and (e) the accounting and allocation of expenses, such as the expense of the restaurant roof repair being charged to the Association became issues in early 2007, as the Association started probing into the Partnership's demand on the Unit Owners for additional capital.  The audited financial statements show that the Partnership had about as much actual cash on hand as of April 30, 2007, when the Partnership began requesting funding from the Association for cash flow deficiencies, as the Partnership had on hand in prior years when the Association had not been requested to fund Hotel operations.

It is not necessary for this Court to make, nor is this Court making, a finding of impropriety or malfeasance in the operations of the Partnership.  However, serious concerns exist regarding these matters and it is important to the analysis in this case that these accounting issues and questions were discovered by the Association at a time when the Partnership was saying it did not have money and was requesting that assessments be made under the 1984 Agreement to cover operating shortfalls of the Hotel.

G.    **The Rejected Proposed Special Assessments.**

Beginning in December 2004, Dr. Klauber made a proposal to the Association that the Unit Owners be specially assessed for the costs of a comprehensive repair of the buildings and common areas at The Colony.  (Partnership Ex. 51.)   At the urging of the Partnership, the Association engaged an engineering firm in December of 2004.   Karins Engineering Group ("**KEG**") was engaged to provide a report documenting the existing condition of The Colony's structural components and exterior and to make recommendations for repairs. Ms. Moulton oversaw this project and KEG provided an Observation Report in January of 2005. (Ex. 62.) Later, KEG estimated the cost of the project in a Project Manual relating to the proposed work and a Repair Work Letter estimating the costs at $10.6 million.

During the subsequent months of 2005, the Association considered the distinction between those elements of the proposed work that would qualify as an alteration and improvement of common elements and those which would qualify as maintenance, repair or replacement of common elements.  (Ex. 72; Ex. 75.)  Efforts were made to identify items that would change the form, function or appearance of the common areas, and which items would require approval of the Unit Owners.  (Partnership Ex. 150.)

On December 7, 2005, pursuant to and in compliance with the Governing Documents, and applicable Florida law, and with the agreement of the Partnership, the Association submitted a series of matters for vote by the Unit Owners at the annual meeting of the Association, including a special assessment in the amount of $10.6 million to undertake the repairs identified in the KEG reports.  (Ex. 283.)  The Board made no recommendation as to whether the Unit Owners should approve the proposed assessment.  (5/21/09 Tr. 104:18-105:7.)  The proposed special assessment required a majority vote, equal to an affirmative vote by 119 Unit Owners, to

pass; at the Unit Owners' annual meeting on December 22, 2005, only 59 votes (less than 25%) were obtained in favor of the proposed $45,000 per unit special assessment. (Ex. 283 at 5.)

Following the first failed vote and after additional discussions with the Board, Dr. Klauber asked the Association to submit the special assessment for repairs to another vote of the Unit Owners. (Ex. 187 at 16:21-24.) Mr. Mitchell also testified that the Partnership requested that the Association fund the repairs. (5/26/09 Tr. 63:13-21, 64:6-9.) The Board did so, this time with the endorsement of five members of the Board in support of the assessment and two members opposed. Prior to the second vote on Dr. Klauber's proposed special assessment, Dr. Klauber circulated to all Unit Owners a presentation of his "Proposed Repair Project." (Ex. 309.) In the presentation, Dr. Klauber acknowledged that a majority vote of the Unit Owners was required to pass the proposed special assessment.

The General Partner attempted to make its case to the Unit Owners as to why they should support the proposed special assessment. This included a presentation of financial projections suggesting that the Unit Owners, at least in the General Partner's estimation, would likely receive substantial cash distributions in the future despite having received virtually no cash distributions since 1984. (Ex. 309; Ex. 319; 6/1/09 Tr. 94:7-25.) The General Partner attempted to address growing concerns of the Unit Owners regarding the General Partner's business practices and alleged conflicts of interest. The General Partner tried to assuage the Association's suspicions regarding the loans that the Partnership had made to the Klauber Businesses, Dr. Klauber's loan guarantee fee charges, the intercompany transactions involving the Klauber Businesses, and the other alleged conflicts of interest regarding Dr. Klauber that concerned the Unit Owners. (Ex. 309.)

With the encouragement of Dr. Klauber, the Association's Board put the matter to a second vote of the Unit Owners on November 25, 2006, at a special meeting.  (Ex. 284.)  This time, there were 93 votes (40%) in favor of the assessment.  (Ex. 284.)

After the second vote failed to pass the special assessment, the General Partner reviewed its existing allocation of expenses charged against the Association as "Obligation" expenses. The Partnership then reallocated additional expenses to the Association, including the electric and water expenses for operating the Hotel's laundry.  According to the Partnership's chief financial officer at the time, one purpose behind this accounting reallocation was so that greater distributions to the General Partner would be generated to off-set the General Partner's growing indebtedness to the Partnership.  (Ex. 288 at 1.)

**H.**    **The Board's Actions After the Rejected Special Assessments.**

On December 23, 2006, the Association's outgoing Board began its annual meeting in the morning before the annual meeting of Unit Owners.  (Partnership Ex. 54.)  At that morning meeting, Ms. Moulton presented the outgoing Board with a proposed budget for the fiscal year beginning on May 1, 2007, and ending on April 30, 2008.  (Partnership Ex. 54.)  The proposed budget required that the Association fund an anticipated Hotel cash flow deficit and fund an account to begin refurbishing the exteriors of certain condominium units.  (Ex. 113; Ex. 135.) After confirmation from the Association's legal counsel that the "budget could be reviewed and amended" by the new *incoming* Board, the outgoing Board voted to adopt the General Partner's proposed budget for the upcoming year, subject to re-evaluation by the new Board to be elected that same day by vote of the Unit Owners.  (Partnership Ex. 54.)

After the outgoing board adjourned the Board meeting, the Association held its annual meeting of the Unit Owners, where the president of the Association, Mr. Salvatore J. Zizza, announced that the outgoing Board had approved the budget and the assessment proposed by Ms.

Moulton.  (Ex. 285.)  However, Mr. Zizza explicitly stated that the budget and assessment were approved subject to the review of the incoming Board that would be elected later that day.  (Ex. 285; 5/21/09 Tr. 143:14-22.)

Thereafter, the Unit Owners' ballots were counted, and the Unit Owners elected three new Board members.  (Ex. 285 at 2.)  The new Board met immediately after the annual meeting.  (Partnership Ex. 54.)  By a majority vote, the Board agreed to review the information that had been provided by the General Partner and the request for funding and to consider modifying the budget and assessment approved by the previous Board for the fiscal year beginning May 1, 2007.  (Ex. 285 at 3.)

The new Board established an "accounting committee" to assess the profitability of the Hotel, the General Partner's conflicts of interest and business practices, the General Partner's reallocation of expenses to the Association as additional "Obligation" expenses under the 1984 Agreement, and the General Partner's request that the Association fund the Hotel's anticipated cash flow shortfall.  (Partnership Ex. 55.)

The accounting committee of the Board later determined that the Hotel had sufficient cash on hand to cover its alleged cash flow shortfall.  (5/29/09 Tr. 153:20-154:23.)  Significantly, the Partnership did not attempt to prove or quantify at trial the amount of a cash flow shortfall, if any, that the Partnership actually experienced at that time.

The accounting committee also determined that the General Partner had an incentive to continue Hotel operations indefinitely without regard to the profitability of the Hotel.  The accounting committee found that the General Partner had been taking substantial distributions in recent years even though Hotel operations had not generated profits, or enough cash, to support such distributions.  Each year Dr. Klauber paid himself, through one or another of his business

entities, between $750,000 and $1,000,000 from the revenues of the Hotel.  After reviewing eight years of the Partnership's financial statements, the audit committee determined that these payments included:  (i) Lease payments and management fees to the Manager and CBI of $410,000 to $720,000 per year; (ii) purchases of food and wine baskets from Tastebuds of close to $200,000 per year; (iii) office rent of $33,000 to $51,000 per year; and (iv) loan guarantee fees of $28,000 to $87,000 per year.  The accounting committee also noted was that the General Partner billed the Association for $1,527,000 worth of entertainment expenses at Dr. Klauber's restaurants between 2000 and 2007, which they computed as an average of $700 per day worth of food and wine purchased for Dr. Klauber, Ms. Moulton and their guests. (5/29/09 Tr. 307:14-25.)

In addition to investigating the General Partner's financial practices and claimed operational shortfalls, the Association undertook and completed, with KEG, a series of projects intended to maintain the common elements and to ensure the safety of the buildings at The Colony.  The Board directly engaged KEG in February 2007.  (5/27/09 Tr. 30:6-9.) KEG had previously worked for "The Colony" under the direction of Ms. Moulton.  (5/27/09 Tr. 30:10-16.)

The Board directed KEG to make regular inspections, which have occurred quarterly, and to address necessary repairs.  Since February 2007, David Jeffrey Karins, P.E. ("**Mr. Karins**") has certified that the condominium units have been safe for occupancy, or he has arranged for repairs, with the Board's authorization, which have made the units safe for occupancy.  (5/27/09 Tr. 57:20-25, 58:1-5, 76:14-21.)  These projects have included reframing several balconies, shoring up the structural supports for the kitchen of some units, replacing the building siding as needed and re-shingling roofs.

KEG has also prepared, at the Association's request, a plan for repairs to keep the condominium units safe for occupancy over the next three years.  (Ex. 104; 5/27/09 Tr. 59:15-18.)  The proposed plan includes painting and possible sealing of the unit exteriors to improve the appearance of the buildings.  (5/27/09 Tr. 61:19-20.)

Mr. Karins determined that maintenance of the unit siding had been neglected and that painting and sealing had not been performed for ten years which exacerbated the deterioration that has been occurring over the lives of the units.  (5/27/09 Tr. 69:1-6.)  Mr. Karins concluded that the condominium exteriors had essentially worn out over time and had reached the end of their useful lives.  According to Mr. Karins, The Colony suffered minimal effects of the 2004 hurricanes that impacted other parts of Florida.  (5/27/09 Tr. 68:9-21.)  The evidence established that an insurance claim of about $200,000 for the hurricane damage was paid.

In April 2007, the Board decided not to accept the General Partner's proposed budget. Instead, the Board adopted its own budget for the fiscal year set to begin on May 1, 2007. (Partnership Ex. 56 at 3.)  On May 1, 2007, as the Association was just beginning the new fiscal year, the Partnership sued the Association to compel the Unit Owners to pay the requested special assessments.  (Doc. No. 1.)

## CONCLUSIONS OF LAW

The Partnership, led by Dr. Klauber, twice failed to persuade the Unit Owners to vote in support of its requested special assessment to rebuild The Colony and to contribute funds to support the operations of the Partnership.  The Partnership then failed to persuade the Board to assess the Unit Owners to implement its requests, notwithstanding the absence of approval from the Unit Owners.  Now, the Partnership asks this Court to intercede on its behalf and declare that

the Association had an obligation to put into action the Partnership's proposed renovation and operating plans through an involuntary assessment of its members.

This Court denies the relief sought by the Partnership. The Association's assessment responsibilities are defined by Florida law and the Association's Governing Documents. The Unit Owners have the right under the Condominium Act to administer their condominium property. Condominium associations are creatures of statute. The assessment of the members of a condominium association must be strictly construed to assure those investing in condominium property that "what the buyer sees the buyer gets." *Sterling Village Condo., Inc. v. Breitenbach,* 251 So. 2d 685, 688 (Fla. 4th DCA 1971); *see also Schmidt v. Sherrill,* 442 So. 2d 963, 965 (Fla. 4th DCA 1983) ("declarations of condominium must be strictly construed"); *Scudder v. Greenbriar C. Condo. Ass'n,* 663 So. 2d 1362, 1368 (Fla. 4th DCA 1995) ("Condominium associations are strictly creatures of statute, and their powers and duties, including the raising of funds, must be strictly construed.").

The Court concludes that the Governing Documents do not obligate the Association to repair and renovate the buildings and common elements for the benefit of the Partnership or to contribute to the ongoing operational expenses of the Partnership. The Association's Governing Documents were not amended to incorporate the assessment mechanisms or any other terms or provisions of the 1984 Agreement, which never became a Governing Document. Moreover, any obligation of the not-for-profit Association to underwrite the operating shortfalls of the Partnership would be *ultra vires.* This Court will not rewrite the Governing Documents to deprive the Unit Owners of the protections to which they are entitled. Accordingly, all relief sought by the Partnership and the Manager is denied.

**A.     The Governing Documents Do Not Require That the Association Maintain a First-Class Resort Hotel.**

Any analysis of the propriety of the actions of a condominium association must begin with the Association's Declaration.  A declaration of condominium is more than a mere contract spelling out mutual rights and obligations of the parties.  *See Pepe v. Whispering Sands Condo. Ass'n,* 351 So. 2d 755, 757-58 (Fla. 2d DCA 1977).  It assumes some of the attributes of a covenant running with the land, circumscribing the extent and limits of the enjoyment and use of real property.  Absent consent, or an amendment of the declaration of condominium as may be provided for in such declaration, or as may be provided by statute in the absence of such a provision, this enjoyment and use cannot be impaired or diminished.  *Id.*

Florida courts consider the declaration of condominium to be the condominium's "constitution."  *See, e.g., Woodside Village Condo. Ass'n v. Jahren,* 806 So. 2d 452, 456 (Fla. 2002) (citing *Schmidt v. Sherrill*, 442 So. 2d 963, 965 (Fla. 4th DCA 1983)).  Therefore, actions taken in a condominium community must be taken by the procedures and under the framework set out in the declaration of condominium.  Even if the action is "desirable, sensible and expedient," it may not be taken if it is not done according to the declaration of condominium. *Pepe,* 351 So. 2d at 757.

The Partnership argues that the Governing Documents create a contractual obligation by the Association to the Partnership to maintain The Colony as a first-class resort hotel.  The foundation of the Partnership's claim is a contention that the Declaration establishes certain categories of common expenses relating to the condominium, that the Association is obligated to pay those common expenses, and the Association has not paid them.

A sensible reading of the plain language of the Governing Documents, however, confirms that they impose no obligation on the Association to own, operate or maintain a hotel.  Where a

contract is unambiguous, courts may not impose additional contractual terms.  *Peach State Roofing, Inc. v. 2224 S. Trail Corp.,* 3 So. 3d 442, 442 (Fla. 2d DCA 2009); *Langford v. Paravent, Inc.,* 912 So. 2d 359, 362 (Fla. 5th DCA 2005) ("parole [sic] evidence may not be used to add to the terms of an otherwise valid contract").  The Declaration makes only a passing reference to the operation of the Hotel in describing the Partnership.  (Ex. 13 at § 3.11.)  The Declaration provides no specific or affirmative obligations and sets no standard that the Association must achieve in the maintenance and repair of The Colony.

The Articles and Bylaws are equally muted in reference to the operation of the Hotel and are altogether silent as to the quality in which the common elements must be maintained.  The Articles reference the Hotel, in passing, by stating that the Association is organized pursuant to the Declaration "of COLONY BEACH & TENNIS CLUB, a Condominium Resort Hotel."  (Ex. 14 at § 3.2.)  This is only a notation of a name and does not establish a standard or affirmative obligation of the Association regarding the operations of the Hotel.  The Bylaws make the same generic reference to the legal name of the condominium and nothing more.  (Ex. 15 at § 1.)

Although the Partnership Agreement references the Hotel's operation, it imposes no contractual obligation on the Association relating to the Hotel operation.  It provides that "each Limited Partner shall make the condominium unit or units owned by him in the Project . . . available at all times for occupancy by third parties as rental accommodations in connection with the business of the Partnership."  (Ex. 22 at § 10.1.)  However, the Association is neither a Limited Partner, nor a party to the Partnership Agreement.

Not until the execution of the 1984 Agreement did the reference to a "first class resort hotel" appear in the document.  Even then, the reference is used to modify an obligation of the *Partnership*.  The 1984 Agreement provides that the Partnership shall pay the Obligations only

after the "establishment of such reserves as are deemed necessary and appropriate for the continued operation of the Project as a first class resort hotel."  (Ex. 27 at 4.)

The only other reference to a "first class resort hotel" is found in the Tenth Amendment, an agreement to which the Association is not a party and by which it is not bound.  The Tenth Amendment provides that "[c]ash Available for Distribution shall be computed after deducting from Partnership income . . . all reserves . . . which are deemed necessary and appropriate for the continued operation of Colony Beach & Tennis Club as a first class resort hotel . . . ."  (Ex. 23 at ¶ 2.)  The seminal aspect of the Tenth Amendment is the obligation of the Partnership, not the Association, to pay all of the expenses that the Partnership incurs in operating and maintaining the Hotel for as long as the Partnership controls the usage of the condominium units and the common elements.

The Partnership became directly responsible for the payment of all of the expenses incurred in its operation of the Hotel, including the expenses relating to the common elements of the condominium, when the Tenth Amendment was approved by the General Partner and the Limited Partners.  As evidenced by the audited annual financial statements of the Partnership, all of these expenses were incurred and paid by the Partnership, year after year, from the revenues derived from operating the Hotel.  These expenses were not duly incurred by the Association and were never reflected as expenses of the Association in the Association's separate audited annual financial statements.

## B.    Unit Owners May Not Be Involuntarily Assessed While the Partnership Remains in Possession.

A condominium unit owner's duty to pay assessments is conditional solely on whether the unit owner holds title to a condominium unit and whether the assessment conforms to the declaration of condominium and bylaws of the association.  *See Ocean Trail Unit Owners Ass'n*

*v. Mead,* 650 So. 2d 4, 7 (Fla. 1994).   The Governing Documents at issue here include exculpatory language that bars assessment of the Unit Owners in the circumstances that exist in this case.

The Declaration provides that "[u]nit owners who have made available the use of their unit to the Partnership will be relieved of paying assessments only to the extent that the Partnership makes such payments and assumes all other responsibilities of a unit owner in that regard."  (Ex. 13 at § 7.2.)  Likewise, the Bylaws provide that as long as the unit is being made available to the Partnership for use as a hotel, "and said partnership is paying any of those items defined as common expenses in the Declaration of Condominium for such units, said unit owner will be relieved of his responsibility for paying those items to the extent that said partnership makes such payments and assumes all other responsibilities of such unit owner in that regard." (Ex. 15 at § 6.5.)   In the 1984 Agreement and the Tenth Amendment to the Partnership Agreement, the Partnership assumed the obligation to pay the common expenses and did, in fact, pay such expenses until this lawsuit was filed.

Further, the Partnership Agreement confirms that, with respect to the Limited Partners' liability to the Partnership, the Limited Partners are not subject to assessment and have no personal liability for Partnership debts.  (Ex. 22 at § 8.1.)  Only the amount committed by a Limited Partner to the capital of the Partnership and their share of undistributed profits is at risk for the payment of debts or losses of the Partnership.

The Partnership Agreement also provides that the units were not contributed to the capital of the Partnership nor are they the property of the Partnership.  (Ex. 22 at § 10.1.)  The units remain the property of each Limited Partner, and the only interest of the Partnership is its right to use the unit.  (Ex. 22 at § 10.1.)

The Tenth Amendment makes clear that the Partnership is responsible for the Obligations of the Association, but only to the extent that the Partnership has available funds. (Ex. 23 at 3.) However, this limitation does not mean that the Partnership can pay expenses of the Association and then seek reimbursement from the Association for any amounts the Partnership actually paid. This provision does not require the Association to make any special assessment of the Unit Owners to fund the Partnership's operating shortfalls.

C.    **The Governing Documents Require That a Special Assessment Must Be Approved By a Vote of the Unit Owners.**

The fundamental nature of the relief sought by the Partnership is for this Court to impose an assessment on the Unit Owners in the absence of a vote in favor of the assessment by the Unit Owners.  However, it is undisputed that prior to the filing of this action by the Partnership, there was no disagreement that the special assessment requested by the Partnership required the vote of the Unit Owners.

In December 2004, at the first mention of an assessment for the reconstruction, the Board determined that any assessment must be put to a vote.  After the first vote failed on the special assessment, the Partnership continued to state in the materials sent to Unit Owners encouraging them to support the special assessment that the "vote required to pass the assessment for repairs is 51%."  (Ex. 309 at 4.)  The Partnership's witnesses, Mr. Zizza, the president of the Board at the time (5/21/09 Tr. 136:11-13), Steven Mitchell, the attorney for the Partnership (5/26/09 Tr. 87:24-88:13), and Ms. Moulton (5/26/09 Tr. 251:16-21, 252:25-253:1-5), all testified that submitting the proposed special assessment to a vote of the Unit Owners was necessary and appropriate.

It is clear from the record that all parties acted, for several years, under the common view that any special assessment to rebuild The Colony or to fund the operations of the Partnership

34

must be approved by a vote of the Unit Owners.  This requirement is found in the Governing Documents and was not changed by the 1984 Agreement.  The actions and statements of the parties reflect that everyone agreed that the special assessment required such an affirmative vote. To conclude that the Partnership could force the Association to make an assessment after the Unit Owners twice voted it down would not only contravene the Governing Documents, it would contradict the intent and conduct of the parties and illogically establish that Unit Owners, who could not be assessed as Limited Partners or assessed as Unit Owners without their affirmative vote, relinquished the power of assessment to the Partnership over whom they had no control or influence.

The Declaration provides that "[t]he making and collection of assessments against Unit Owners for common expenses shall be pursuant to the Condominium Act and Bylaws and subject to the provisions thereof and as hereinafter provided."  (Ex. 13 at § 7.1.)  As described in the Bylaws, there are two types of assessments at The Colony: annual assessments and emergency assessments.  (Ex. 15 § 6.)  The Bylaws set out procedural mechanisms that must be met for both.  (Ex. 15 § 6.)

Annual assessments are addressed in the Bylaws which require that the annual assessment be made before the start of the fiscal year.  (Ex. 13 § 6.3.)  If the annual assessment does not provide sufficient capital, the Board may adopt an amended budget as long as the budget, as amended, does not exceed the budget limitations for that year.  If the change exceeds that amount, it must be put to a vote of the Unit Owners.

Emergency assessments are addressed in the Bylaws which require that the Unit Owners receive notice as to why the assessment is necessary.  (Ex. 13 § 6.6.)  Following notice, written approval for the emergency assessment must be received "by persons entitled to cast more than

one-half of the votes of the unit owners concerned." (Ex. 15 at § 6.6.) If the majority does not

approve the assessment, it does not become effective.

The 1984 Agreement specifically addressed assessments relating to the construction

projects proposed by the Partnership. That agreement (Ex. 27 at 4) provides:

> Major capital improvements (the "Capital Improvements")
> including, but not limited to, road replacement, roof replacement,
> condominium unit siding replacement, or air conditioning
> replacement, as well as expenditures to repair or replace equipment
> and property (real and personal) that are damaged by Acts of God
> (the "Casualty Expenditures") such as, without limitation, floods,
> freezes, tornadoes, hurricanes, wind and water, shall be deemed
> part of the "Obligation" of the Association and funded by the
> Partnership to the extent as provided herein, with any amount not
> so funded being paid by the Association by special assessment of
> its members pursuant to the terms of the Declaration.

The significance of the use of the word "special" to modify assessment in the 1984

Agreement cannot be overlooked. In 1984, the definitional section of the Condominium Act was

amended to add a definition for "special assessment." Ch. 84-368, Laws of Fla. Under the

Condominium Act, "special assessment" is defined as "any assessment levied against a unit

owner other than the assessment required by a budget adopted annually." Fla. Stat. 718.103

(2009). The Condominium Act requires that a "special assessment" be accompanied by a notice

which sets forth "the specific purpose or purposes of any special assessment." Fla. Stat.

§ 718.116 (2009). Similarly, the Bylaws state that an emergency assessment requires a "notice

of the need for such" assessment. (Ex. 15 § 6.6.) By using the term "special assessment," the

1984 Agreement distinguishes between an assessment needed to make capital repairs and

improvements and an assessment to fund the Association's annual budget. By this distinction, it

is manifest that an assessment for repairs and improvements must be put to a vote of Unit

Owners. The only type of assessment that the Governing Documents authorize without Unit

Owner vote and approval is the annual assessment, which is why all of the witnesses agreed that the proposed special assessments required Unit Owner vote and approval.

There is no basis for interpreting the Governing Documents or the 1984 Agreement to confer on the Partnership the power to control the Association's assessments. The Governing Documents do not and could not, authorize anyone other than the Association's Board and the Unit Owners to govern and assess the Association's membership.

**D.**     **The Board's Decision Regarding the Assessment on the Unit Owners After Two Failed Votes Was a Proper Exercise of the Board's Responsibility.**

When the Unit Owners failed to pass the special assessment, the General Partner proposed that the rebuilding project instead be broken into a series of smaller annual assessments so that a few buildings could be rebuilt each year. The Board's decision not to adopt that proposal, following the two votes of the unit owners rejecting the special assessment, was a proper exercise of the business judgment rule and will not be overturned by this Court.

The "business judgment rule" protects an association's board of directors' business judgment as long as the board is making decisions in good faith. *Cedar Cove Efficiency Condo Ass'n v. Cedar Cove Props., Inc.,* 558 So. 2d 475, 479 (Fla. 1st DCA 1990) (recognizing the board's "authorization to regulate and maintain the condominium's aesthetics, including the building exteriors, so long as it exercises good business judgment").

In Florida, corporate directors generally have wide discretion in the performance of their duties and a court should not attempt to pass upon questions of the mere exercise of business judgment, which is vested by law in the governing body of the corporation. *Lake Region Packing Ass'n v. Furze,* 327 So. 2d 212, 216 (Fla. 1976). When applying the business judgment rule, a court should start with the presumption that the Board acted in good faith. *Kloha v. Duda,* 246 F. Supp. 2d 1237, 1244 (M.D. Fla. 2003). "[I]n the absence of a showing of abuse of

discretion, fraud, bad faith or illegality," the Board's decision should not be second guessed. *In re Bal Harbour Club, Inc.,* 316 F.3d 1192 (11th Cir. 2003) (citing *Int'l Ins. Co. v. Johns*, 874 F.2d 1147, 1461 (11th Cir. 1989) and applying Florida law to a not-for-profit corporation). The premise behind the business judgment rule is that the board of directors is in the best position to make important decisions about the direction the corporation should take. *Id.* at 1458 n. 20 ("The business judgment rule is a policy of judicial restraint born out of the recognition that directors are, in most cases, more qualified to make business decisions than are judges.")

Other courts have applied the business judgment rule to decisions made by the board of directors of condominium associations. *See, e.g., Papalexiou v. Tower W. Condo.,* 401 A.2d 280, 286 (N.J. Super. Ct. Ch. Div.) ("Courts will not second-guess the actions of directors unless it appears that they are the result of fraud, dishonesty or incompetence."); *Ryan v. Baptiste,* 565 S.W.2d 196, 198 (Mo. Ct. App. 1978) ("Members of the Board of Managers are elected by the condominium owners to oversee and protect the rights and interests of the community at large. Accordingly, the Board is vested with considerable discretion with which to execute its managerial and administrative responsibilities.").

The Partnership has asked this Court to overrule a decision that has already been made by the Board. The Partnership presented the opinion of an expert economist, Dr. Henry Fishkind ("**Dr. Fishkind**"), that the Unit Owners would recognize a large return on investment if The Colony was rebuilt. Similar contentions were made by the Partnership in promotional materials provided to the Unit Owners prior to the second failed vote. (Ex. 309 at 13-15.) The Partnership's attempts to supplant the Board's decision with that of this Court, or Dr. Fishkind or the Partnership's opinion of what is best for the Association ignore the business judgment rule.

The decisions reached by the Board should not be overturned unless the Partnership can show that the Board abused its discretion, or that it engaged in fraud, bad faith or illegality.  The Partnership has not carried this burden.  Instead, the facts show that the Board acted carefully, deliberately and responsibly.  The Board carefully analyzed the available information regarding the finances of the Partnership and the Association, studied the business model and relationship under which the Hotel currently and historically operated, studied the reliability of the Partnership's future projections, which were unsupported by prior performance, and considered the serious question of whether the General Partner was acting for the benefit of the Unit Owners or for the benefit of the Klauber Businesses.  After several meetings and much deliberation weighing all these factors, the Board decided that it would not break the $12 million proposed assessment into smaller assessments over a longer period of time as a means to circumvent the expressed will of the Unit Owners in their votes against the special assessment.

In February 2007, following the second failed vote, the Board met over a two-day period to evaluate many of the issues relating to the business operation.  (Ex. 287.)  At that meeting, the Board received a summary of the audit committee's review of the Partnership's financials and asked pointed questions relating to the intercompany loans by the Partnership to the Klauber Businesses, the guarantee fee paid to Dr. Klauber, the 1973 fixed Preferential Amount, and the General Partner's negative capital account.  (Ex. 287 at 2-4.)  The Board was also informed that the Partnership was projecting a cash flow shortfall for the remainder of the fiscal year and that the Partnership wanted the Board to make a special assessment of the members of almost $600,000 to cover that shortfall.  At the same time, the Board was also investigating the Partnership's method of allocating expenses to the Association in order to increase the

distribution to the General Partner under the distribution formula established in the Partnership Agreement.  (Ex. 132.)

As a result of the business structure of the Partnership, the distributions to the General Partner were not tied to cash flow or to profit from the Hotel but rather to how much of the Hotel's expenses could be allocated to the Association to exhaust the Preferential Amount. Therefore, even in years when the Hotel was operating at a loss, the General Partner would still receive substantial distributions.  As an example, in 2008 the Hotel lost $1.066 million, but the General Partner took a cash distribution of $120,594.  (Ex. 319.)  Even though the Partnership claimed it could not pay utilities and insurance, the Partnership paid a six-figure distribution to the General Partner.

With this information and awareness, the Board, consisting of individuals elected by the Unit Owners, determined in good faith that the Association would not benefit from assessing the members to rebuild The Colony.  That this decision was a sound business decision was confirmed by the Association's expert witness, Mr. Plasencia, who testified that he would have advised the Association and Unit Owners not to invest any money in the Hotel for as long as the current business model remains in place.  Mr. Plasencia concluded that a refurbished Hotel would not become competitive or profitable under the existing business model.  Mr. Plasencia also concluded that renovation of the condominium unit exteriors does not make economic sense because the buildings and lay-out of the buildings at the Hotel are functionally obsolete and inefficient.

In summary, the Board's decision to not institute an annual assessment to rebuild The Colony, consistent with the earlier votes of the Unit Owners, was not an abuse of discretion or

the product of fraud, bad faith or illegality and, therefore, under the business judgment rule, it must stand.

E.    **To the Extent the 1984 Agreement Requires the Association to Underwrite the Partnership's Operation of the Hotel, It Is *Ultra Vires*.**

The 1984 Agreement provides that the Partnership "shall" pay the Obligations as long as "cash is available to the Partnership."  (Ex. 27 at ¶ 2.)  Therefore, the Partnership was obligated to continue to pay the Obligations until cash was no longer available.  Immediately following the second failed vote, the Partnership began claiming that it needed an infusion of cash. (Partnership Ex. 54; Partnership Ex. 55.)  The General Partner and Manager demanded that the Unit Owners be assessed to cover this anticipated shortfall.  The Partnership asserts that the Association has an obligation to fund the operating losses of the Partnership's Hotel enterprise because the Association is a party to the 1984 Agreement.  In essence, the claim is that the Association is obligated to assess its members to make up any cash flow shortfalls that the Partnership cannot fund through Hotel revenues.

The Court rejects this interpretation of the 1984 Agreement.  First, it is contrary to the Association's function under the Governing Documents.  Such obligation, to subsidize another entity's operating losses, is outside the object for which the Association was created. It unlawfully usurps the statutory powers reserved exclusively to condominium associations. Accordingly, to the extent the Association was obligated to function as the guarantor, under the 1984 Agreement or any other agreement, of the cash flow needs of the for-profit Partnership, the Association has counterclaimed seeking a declaration of this Court that such an agreement by the Association would be *ultra vires*.

The Association is a not-for-profit condominium association.  As such, the Association may only engage in activities that are not for pecuniary gain and may only exercise those powers

enumerated in the Condominium Act.  To exceed these parameters would be an *ultra vires* act by the Association.

As explained by the Florida Supreme Court:

> an act of a corporation is *ultra vires* "when it is outside the objects for which the corporation was created as defined by the laws of its organization and limited by the statutes authorizing its existence. In other words, it is an unauthorized act.  In its primary sense, an act is 'ultra vires' the powers of a corporation when it is wholly outside of the scope of the purpose for which the corporation was formed or has its being, and which it has no authority to perform under any circumstances or in any mode.  In a secondary sense, an act is said to be 'ultra vires' as it affects the rights of parties without whose consent it may not be done, or when the corporation is not authorized to perform it for the specific purposes or in the particular manner involved, notwithstanding it may come within the scope of its general powers."

*Knowles v. Magic City Grocery,* 197 So. 843 (Fla. 1940) (quoting Thompson on Corporations 525 (3d ed.)); *see also Liberty Counsel v. The Fla. Bar Bd. of Governors,* 34 Fla. L. Weekly S347 (Fla. June 4, 2009) (same).

Action taken by a condominium association that does not comply with the declaration of condominium is *ultra vires*.  *See Bramson v. Beau Monde, Inc.,* 415 So. 2d 761 (Fla. 2d DCA 1982).  In *Bramson*, the declaration allowed the association to take corporate action by written consent in lieu of a meeting if all members entitled to vote agreed in writing to the action being taken.  The association purchased recreational property from the developer purportedly by a written consent.  Several unit owners who did not consent to the transaction successfully challenged the acquisition.  The court held that the association's action, absent the written consent of all unit owners, was *ultra vires*.

The actions of a not-for-profit corporation that is also a condominium association are even further restricted by the Condominium Act.  A condominium association "may exercise only those powers enumerated in the Condominium Act, which expressly provided that the

association may grant itself in the Declaration of Condominium and bylaws only those powers not inconsistent with the Act." *Towerhouse Condo., Inc. v. Millman,* 475 So. 2d 674, 676 (Fla. 1985).  In *Towerhouse*, the Florida Supreme Court held that the condominium association was not permitted to purchase an adjacent parking lot because the Condominium Act did not grant associations that power.  *Id.*; *see also Ocean Trail Unit Owners Ass'n, Inc. v. Mead,* 650 So. 2d 4, 8 (Fla. 1994) (finding "powers granted a condominium association in the condominium documents must be consistent with the Condominium Act").

The Articles of the Association state that the purpose of the Association "is to provide an entity pursuant to . . . the Condominium Act."  (Ex. 14 at § 2.1.)  The Articles provide that "[t]he Association shall have all of the powers and duties set forth in the Condominium Act of the State of Florida . . . and all of the powers and duties reasonably necessary to operate the Condominium pursuant to such Declaration . . . ."  (Ex. 14 at § 3.2.)  Specific powers of the Association are then listed and include making and collecting assessments; maintaining, repairing and replacing the common elements; and purchasing insurance.

Chapter 718 of the Florida Statutes also lists powers that condominium associations may exercise.  These include the power to manage condominium property, to contract, to sue and to be sued; the power to make and collect assessments and to lease, maintain, repair and replace common elements; and to access units to make repairs to, repair or replace common elements. Fla. Stat. § 718.111 (2009).

The Partnership urges this Court to follow the reasoning of the Texas appellate court in *Hackberry Creek Country Club, Inc. v. Hackberry Creek Home Owners Ass'n.*, 205 S.W.3d 46 (Tex. Ct. App. 2006).  *Hackberry* is distinguishable on both procedural and legal grounds.  In *Hackberry*, a Texas court of appeals was asked to review the trial court's grant of summary

judgment in favor of a homeowners' association in a dispute arising out of a membership agreement.  Under the membership agreement, the association was obligated to pay 20% of its "annual" assessments to a country club.  After twenty years of operating under this agreement, the association tried to reduce its payments by amending its declaration to create a new type of assessment and reclassify some expenses previously deemed "annual" assessments to the new type of assessment.  As a result of that action, litigation ensued and the association sought a declaratory judgment that it could amend the declaration to create the special assessment class and avoid, in part, its obligation to the club.  The club countersued seeking a declaration that the association's actions were a breach of the membership agreement.

Legally, *Hackberry* is distinguishable from The Colony because *Hackberry* involves a contractual relationship where the homeowners' association was legally obligated to pay, according to the 20% formula, for usage of the country club; but here, the Partnership argues that the Association is obligated to subsidize the Hotel's operating shortfalls. In *Hackberry*, the parties argued over the amount of the contractual obligation; in this case, the Court is being asked to determine the more fundamental issue of whether there is any lawful obligation. Therefore, where the court in *Hackberry* found that the association was trying to avoid a binding contractual obligation for actual usage of services by reclassifying the association's assessments, here this Court finds that the Debtor has no lawful obligation to subsidize the for-profit operations of another entity.

The Court concludes that the Declaration, the Articles, the Bylaws and the Condominium Act do not sanction any obligation of the Association to underwrite the for-profit business of the Partnership. Accordingly, the 1984 Agreement is *ultra vires* to the extent it may be interpreted to

require the Association to assess the Unit Owners to fund operational shortfalls of the Partnership.

**F.**     **The Partnership Did Not Prove Damages.**

The Partnership claims that it has sustained damages as a result of the Association's actions.  Because this Court has concluded that the Association did not breach any contract or duty, any request for an award of damages as a result of the Association's actions must be denied.  Likewise, there are no damages that arise from the rejection of the 1984 Agreement.  The Court concludes that if there were any damages, they would be attributed to the General Partner's and Manager's failure to properly budget and establish adequate reserves.

The undisputed facts are that, until 2007, the Partnership had complete control over the condition of the exterior of The Colony.  Under the Tenth Amendment, the Partnership agreed to be directly liable for the "Obligations," including expenditures for repairs, maintenance and insurance of the common areas and expenditures for capital improvements.  Pursuant to the 1984 Agreement, the Association also agreed that the General Partner would prepare the Association's annual budget.  Therefore, under the 1984 Agreement, the Partnership was to make repairs and undertake maintenance to the exteriors as needed.  The Partnership also had the obligation to establish reserves as "necessary and appropriate for the continued operation of [The Colony] as a first class resort hotel."  (Ex. 27 at ¶ 2.)

The undisputed evidence is that the Partnership failed to properly maintain the common elements or to set reserves necessary to fund repairs.  Without distinguishing between exteriors and interiors of the units and the other facilities at the Hotel, Dr. Fishkind testified that the facilities have been in poor condition and have been negatively impacting the Partnership's profitability for at least the past fifteen years.  Ms. Moulton also testified that, other than repainting the buildings every ten or twelve years, very little renovations have been made to the

buildings since they were constructed in the 1970's.  Therefore, Dr. Klauber's own failure to adequately fund the "Obligations" and set aside sufficient reserves is a substantial factor in the poor condition of the Hotel facilities.  For many years, the Partnership understated the estimated replacement costs of the Hotel and underfunded the reserve requirement set forth in the 1984 Agreement.  Because the Partnership's alleged damages were not proximately caused by the Association's actions, the Association can not be responsible for the Partnership's claimed damages.

The Court also rejects the different damage scenarios offered by the Partnership based on the opinions of Dr. Fishkind which give varying damage amounts based on several factors. However, under any scenario offered, the Partnership's damage calculation is speculative, based on many contingencies, and not supported by the historical financial records of the Hotel.

The occupancy rate and average daily rate that the Partnership used to calculate damages have never been attained.  In Florida, a plaintiff must present a "yardstick" by which the amount of damages may be adequately measured.  *See Nebula Glass Int'l, Inc. v. Reichhold, Inc.,* 454 F.3d 1203, 1217 (11th Cir. 2006).  This can be done by analyzing the profits generated by a comparable business.  *See, e.g., Montage Group, Ltd. v. Athle-Tech Computer Sys., Inc.,* 889 So. 2d 180 (Fla. 2d DCA 2004).  The damage measurement can also be based on how the business would have performed, but for the breach.  *See Nebula Glass,* 454 F.3d at 1217.  In either analysis, the purpose is to "place the plaintiff in the same financial position as that occupied before" the damage occurred.  *Ocean Elec. Co. v. Hughes Labs., Inc.,* 636 So. 2d 112, 114 (Fla. 3d DCA 1994).

Florida courts have held that it is inappropriate to award lost profits to a business enterprise that was not making a profit at the time of the breach.  *Brevard County Fair Ass'n v.*

*Cocoa Expo, Inc.,* 832 So. 2d 147, 153 (Fla. 5th DCA 2002) ("a condition precedent to recovery is proof by competent substantial evidence that the business has earned profits for a reasonable time before the occurrence of the wrong."); *Forest's Men Shop v. Schmidt,* 536 So. 2d 334 (Fla. 4th DCA 1988). As noted by the Eleventh Circuit, "[p]rojecting future profits based on the continuation of a substantial existing trend is far different from projecting profits that contradict an existing trend." *Nebula Glass,* 454 F.3d at 1216 n.2.

By the Partnership's own admission, the Hotel operated at a loss for six of the last eight years. The Partnership's damage calculation does not present a yardstick by which damages should be awarded. The calculation does not account for the Hotel's history of being unprofitable and its failure to consistently achieve cash flow numbers comparable to the damages model. As in *Forest's Men Shop*, the Partnership's damage model ignores the Hotel's recent "history of losses" and thus cannot be justified by the Partnership.

Damage awards also should not be based on "a series of assumptions." *Sihle Ins. Group, Inc. v. Right Way Hauling, Inc.,* 845 So. 2d 998, 1001 (Fla. 5th DCA 2003); *see also Alphamed Pharm. Corp. v. Arriva Pharm., Inc.,* 432 F. Supp. 2d 1319, 1351 (S.D. Fla. 2006) (citing *Kidder, Peabody & Co. v. IAG Int'l Acceptance Group N.V.,* 28 F. Supp. 2d 126, 134 (S.D. N.Y. 1998), for the holding that "a claimant cannot establish lost profits with the law's requisite certainty where its calculation is dependent upon a host of assumptions concerning uncertain contingencies, and applies numerous variables about which an expert can only surmise.")

In *Florida Outdoor, Inc. v. Stewart,* 318 So. 2d 414, 416 (Fla. 2d DCA 1975), the court found that a billboard owner was not entitled to damages because there were too many factors involved in assessing whether the billboard would continue to be profitable. *See also Beverage Canners, Inc. v. Cott Corp.,* 372 So. 2d 954, 956 (Fla. 3d DCA 1979) ("[W]here contingencies

could affect the duration of the business, lost profits estimates have been found too speculative to support a substantial recovery."); *Dade County, Fla. v. Palmer & Baker Eng'rs, Inc.,* 318 F.2d 18, 24 (5th Cir. 1963) ("in the event that there are contingencies that must be satisfied before the innocent party is entitled to any profit under the contract, then the fact finder must take into consideration the likelihood that these contingencies will actually be met in determining" damages). As stated by other courts, damages should not be based on a "thin thread of 'what-ifs'" or "best case scenario predictions." *Halliburton Co. v. E. Cement Corp.,* 672 So. 2d 844, 847 (Fla. 4th DCA 1996); *Sun Ins. Mktg. Network, Inc. v. AIG Life Ins. Co.,* 254 F. Supp. 2d 1239, 1247 (M.D. Fla. 2003).

The Partnership's damage model is based on a number of contingencies and assumptions. In addition to the unsupported occupancy rate and average daily rate, the model also assumes that the Partnership would have been able to meet its obligation to renovate the interiors of the units at The Colony. However, the interior renovations were contingent upon the Partnership being able to obtain financing. The record reflects that the Partnership had already pledged all of its assets to secure existing loans and that the Partnership had defaulted on those loans. (Ex. 177; Ex. 49 at 9.) There is no evidence in the record to support the ability of the Partnership to obtain the necessary financing.

Moreover, the damage model assumes that the Association could have obtained a mortgage for the $12 million needed to make the repairs. (Ex. 309 at 8; 5/22/09 Tr. 32:19-20.) There is nothing in evidence to suggest how the Association, a not-for-profit corporation with no independent revenues and very little assets, would have been able to obtain a loan of $12 million dollars.

**CONCLUSION**

For the foregoing reasons and for the reasons stated on the record in open court on July 31, 2009, the Debtor's objections to Claim No. 13 and Claim No. 14 should be sustained and such claims disallowed; the Partnership's claims for damages for breach of any duties or agreements should be denied; the Partnership's request for declaratory relief to require assessments of the Unit Owners to fund ongoing operations of the Partnership or to pay for repairs and renovations should be denied; the Partnership's request for temporary and permanent injunctive relief should be denied; and the Association's request for declaratory relief that the 1984 Agreement is *ultra vires* and unenforceable should be granted.

The Court did not consider the Association's remaining counterclaims against the Partnership and the third-party claims against the General Partner and the Manager because the remaining counterclaims and third-party claims are defensive in nature.  Inasmuch as the Partnership is not awarded any damages against the Association and the claims of the Partnership and the Manager are disallowed, the Association's remaining counterclaims and third-party claims should be denied as moot.[5]  Accordingly, it is

**ORDERED**:

1.      The Debtor's Objection to Claim No. 13 of Colony Beach & Tennis Club, Ltd. is sustained and Claim No. 13 is disallowed in its entirety.

2.      The Debtor's Objection to Claim No. 14 of Colony Beach & Tennis Club, Inc. is sustained and Claim No. 14 is disallowed in its entirety.

---

[5] If any of the Court's rulings in favor of the Association were reversed, the Association's additional counterclaims against the Partnership and the Association's third-party claims against the General Partner and the Manager would no longer be moot and would need to be reconsidered.

3.      The claims of the Partnership seeking recovery of damages against the Association for an alleged breach of (a) the 1984 Agreement and (b) the Governing Documents asserted in Count I of the Complaint are denied.

4.      The request of the Partnership seeking declaratory relief that the Association is obligated to assess its members for the deficiency amounts of the Partnership for the fiscal year beginning May 1, 2007 (and subsequent years) and to additionally assess its members for the cost of the major work and, on a continuing basis, to maintain The Colony condominium as a "first class resort hotel" asserted in Count II of the Complaint is denied.

5.      The request of the Partnership seeking temporary and permanent injunctive relief requiring the Association to assess its members for the deficiency amounts of the Partnership for the fiscal year beginning May 1, 2007, and for the costs of the major work required asserted in Count III of the Complaint is denied.

6.      The request of the Association seeking declaratory relief that the 1984 Agreement is *ultra vires* and invalid asserted in Count I of the Amended Counterclaim is granted.

7.      The claims of the Association seeking (a) an equitable accounting of the Partnership asserted in Count II of the Amended Counterclaim and (b) recovery of damages against the Partnership for breach of the 1984 Agreement asserted in Count III of the Amended Counterclaim are denied as moot as a result of the disallowance and denial of the claims of the Partnership asserted against the Association.

8.      The claims of the Association seeking recovery of damages against Resorts Management, Inc. asserted (a) in Count I of the Amended Third-Party Complaint for breach of fiduciary duty under the 1984 Agreement, (b) in Count II of the Amended Third-Party Complaint for breach of contract under the 1984 Agreement, and (c) in Count III of the Amended Third-

Party Complaint for indemnification under the 1984 Agreement are denied as moot as a result of the disallowance and denial of the claims of the Partnership asserted against the Association.

9.    The claims of the Association seeking recovery of damages against Colony Beach & Tennis Club, Inc. asserted (a) in Count IV of the Amended Third-Party Complaint for breach of contract under the 1984 Agreement and the Management Agreement and (b) in Count V of the Amended Third-Party Complaint for breach of fiduciary duty under the 1984 Agreement are denied as moot as a result of the disallowance and denial of the claims of the Partnership against the Association.

10.    A separate Final Judgment will be entered consistent with this Order.

**DONE** and **ORDERED** in Chambers in Tampa, Florida on <u>November 9, 2009</u>.


_____
K. RODNEY MAY
United States Bankruptcy Judge